May it please the Court, John Wilkerson on behalf of the City of Conway et al. The appellants and the appellees agree on this fundamental issue, that the video of Officer Rachel Hansen, which is the taser video that the Court has, is both true, accurate, and the best evidence of what happened at the moment of the shooting. And it is that evidence, that video, that shows that John Raines took not one, but two steps towards Officer Hansen with a knife in his left hand. Well, that's your interpretation of it. They take a different one. They do, and if I may, I have the video, and I know you have it, and I tried to explain how to sludge it. I've looked at it myself, but my point is, the dispute that you're talking about is a fact dispute. A reasonable fact finder can decide the implication of whether the person was taking a step toward the officer, or whether what looked like a step wasn't actually a step. Those are not legal questions. Well, the video, I can slow it down to half speed. You see him with the knife. He raised that left foot towards her, and is raising the right leg, stepping toward her. By definition, if you have to slow a video down to half speed to make a factual determination, isn't that a fact finder, a fact question? I mean, if you think about it, nobody who was standing there who was a police officer was able to slow things down to half speed. Of course not. Determination was made at full speed. Of course. Right? And I think, the only reason I slow it down is to make it clear what happened. If you see it full speed, you can tell that he takes one step and then a second step before the shots are fired. I only do it at half speed to make sure that we see it as accurately as we can. You're right. Full speed, it shows this. Do we worry at all about the fact that it's a taser camera? You know, cameras record sound and vision, and they don't necessarily always match up. At least that's been my experience with recordings. Fair enough. If we want to discount the video, then we have to rely on the witness statements. The three officers who said they believed that Rachel Hansen's life was in danger. The firefighters who said that Raines was going towards the officer before the shots were fired. And the third party witness, Marjorie Hayes, who said he was going towards the officer. And then more importantly than that, Officer Rachel Hansen, who says, He moved towards me. I believe he was intent on harming me, and I feared. I fired my taser and began to back away as I heard shots being fired. While the shots were being fired, the suspect kept moving toward me. So we have the three officers, which this court in Frederick v. Motsinger, just last October,  looked at the video, which again was a two-dimensional video in the Roger's Superstore, or the Shell Superstore shop in Rogers, and then credited the third party witness, who said, I saw the same things the officers did. Now, if the video disputes that, which it doesn't, then let's talk about what Raines says. Mr. Raines doesn't remember what happened. He says, I threatened to kill my roommate with a knife. I stabbed him. I go outside because I know the police are coming. I stand there with a knife. Sorry, he's left-handed. I stand there with a knife out. They tell me to drop it. I don't drop it. And then I say, what happened next? I don't remember what happens next. So nobody disputes that John Raines took that step and another step towards Rachel Hansen. And the taser video, even at full speed, shows that that's what happened. And so... Just as a matter of facts, if you see the facts in the light most favorable to Mr. Raines, perhaps the reason he can't remember anything after that point is because, in fact, the shots came before he moved again. Well, I mean, I don't know the answer to that question. And I don't either. And that's kind of the point, I guess, is that the lack of memory to me is not necessarily dispositive. I'm not arguing that it is. My only point is that there's nothing to dispute the fact that John Raines took those steps towards Officer Hansen. And if you look at the... You're saying that when the appellee comes before us, the appellee is going to say they don't dispute that Mr. Raines took a step toward the office? Well, actually, what they're going to say is, and they put this in their brief, that the reason he makes those movements is because he was shot in the back. And then he makes the movements. But first of all, there's no evidence of that. Second of all, he was paralyzed by the shot in the back. So their argument is that he's just standing there, he gets shot, and then he moves. But that shot in the back was what paralyzed him. So there's no basis, in fact, for that. The video shows that he took a step before the shots were fired. And, yes, I have to slow it down to make it clear, but that doesn't mean that it's still not clear. It's still undisputed, based on the video, that he took those two steps before the shots were fired. Now, the plaintiff is also going to say, or the appellee, is also going to say, if I'm guessing right, that he wasn't actually going towards her. Well, again, the video shows that he was. He takes the step, his left, right, and then he goes after her after the shots are fired. He lunges after her even after the shots were fired. And the biggest problem I had with the district court's holding was that it never addressed the state of Morgan v. Cook, which to me is the most important case that this circuit has in this kind of case. In a state of Morgan v. Cook, the same undisputed facts are present there as they are here. We have a callout for a, I think in the state of Morgan it was a domestic situation, we have a callout. Here we have a stabbing victim calling for help. Officers show up in a state of Morgan v. Cook. Mr. Morgan has a knife down by his side. Raines shows up, has a knife down by his side. Mr. Morgan, knife by his side. Police say, drop it, drop it. He doesn't drop it. And Raines, knife by his side, drop it, drop it. He instead raises it up. That's a key difference between Morgan and one that helps explain the justification. I think there was another difference, and I was going to ask you about this. I think in Morgan there was just one shot, and the court made it clear there was just one shot to him. And this one we have 21 shots. And I know the district court, I don't think the district court addressed that. Is that a part of this analysis in your view? Well, in the sense that the appellees say that after the shots happened, that's when he came after her. So if we agree that he then came after her, set aside the rest of it. The video shows that he came after her before the shots began. But it's clear from the video he comes after her after the shots even more aggressively. I mean, he's lunging. You see his right leg or his left leg up, he's coming after her. That's further justification for the shooting. So in Morgan, which I wasn't there, obviously, and it wasn't exactly clear, but that one shot failed Mr. Morgan. Here, that first shot didn't fail Mr. Raines. He, in fact, was more aggressive. And it wasn't until, I guess, his legs got taken out from under him by the shot in the back that he finally fell. But even then the officers didn't know what was going on because he still had the knife and was still rolling around. So the law is that the police are supposed to shoot until the threat is over. And it's not like in Morgan where one shot failed, one shot to the chest, if I remember right, failed Mr. Morgan. But the important thing about a state of Morgan v. Cook is the language that this court uses when Mr. Morgan raises his right leg as if to take a step towards the officer. And, in fact, in the discussion, in the order, it goes on to say general direction. As if to take a step in the general direction of the officer established that the shooting was justified. Here, there's no dispute that Mr. Raines took a step, at the very least, in the general direction of Officer Hanson. And so, and this is my fundamental problem with the district court's order, it never addressed the qualified immunity argument. And, in fact, what it did, when talking about QI, it took a very broad view of it. And the court said the use of deadly force during a seizure by police was clearly established, a clearly established right under the Fourth Amendment. That's a broad view of the QI. That is not the way the Supreme Court has instructed district courts to look at QI. In fact, in Brousseau and Saussure, the Supreme Court has said it must be taken in light of the specific context of the case. How would you define it here? How would you describe it, what the clearly established right is, in one sentence? If an individual takes a step. Or not clearly established. If an individual with a knife down by his side takes a step in the general direction of an officer, that is a justified shooting. And it's not clearly established otherwise. If you look at Morgan, there's no way that a police officer in this situation could know Morgan and say, OK, well, he's going to take a step towards me. Can I shoot? Can I not shoot? No, it's clearly established that you can shoot under Morgan. And it's certainly not clearly established that you can't. And especially in this case, he took not one, but two steps with a knife out. Not down by his side like in Morgan. Not raise his right leg as if to take a step. He had the knife out, one step, two step shots. Would the fact dispute of whether the step took place have to be resolved in order to reach the question of clearly established? Well, I don't think there's a dispute about the steps being taken before the shot. And so I don't think there's anything to resolve because the video shows and the testimony of everybody involved says he was going towards her before the shots. So there's nothing to resolve because it's undisputed. The only dispute would be as to why he was going forward. So you're saying that's the that's the dispute as to whether he was going of his own choice or involuntarily due to gunshots. Well, again, if the gunshots happened after he began moving forward, that's not an issue either. There's no issue if he takes a step towards her before the shots are fired. It's a justified shooting, and it certainly entitles the officers to qualified immunity. So whether he did it because he wanted to kill her, whether he did it because he thought she was a unicorn, whatever it was, it doesn't matter. The fact is, he took steps towards her and then the shots were fired. That's undisputed by the video and by the testimony of the witnesses. I have three minutes, a little bit over here. I'm going to reserve the rest if that's all right. Thank you. Thank you, Mr. Wilkerson. Mr. Carter. May it please this honorable court. My name's Dan Carter and I have the pleasure of representing John Raines. We have two points we'd mainly like to concentrate on. And the first is whether there's appellate jurisdiction for this appeal. As this court is well aware of, appellate jurisdiction exists on the issue of qualified immunity only if there is a pure legal issue. This is not a pure legal issue. We've spent about over 10 minutes arguing about the facts that the district court found. And the facts of the district court, this court needs to consider those factual findings as true. So do you agree that it's undisputed that Mr. Raines took a step in the direction toward Officer Hanson? I do not agree. Mr. Raines was on the sidewalk. Okay, he was. If I can back up a minute, this all happened in the span of about one minute. The officers arrived on the scene. The last officer to arrive, I believe, was Officer Hanson, the officer with the taser and the taser cam. Mr. Raines was on the sidewalk, moving back and forth, waving his knife in the air, going, Fine, fine, fine. He was rocking back and forth. He wasn't approaching anybody. Officer Hanson approached Mr. Raines, who was waving his knife, rocking back and forth. She stated that he took a step back and then that he appeared to take a step forward. And that's when the shots rang out. So we do dispute that. And if you also look at the video, the video is taken from an angle. It is not directly looking Mr. Raines in the face. So he did not take a step toward her. He was, at the most, exhibiting the same movement he had, just kind of rocking back and forth. Even one of the defense experts, Thomas Martin, stated that in frame 23 there was not a lunge, there was not a large step, there may have been some movement. That's all he concedes. And that's in the Plaintiff's Response to the Dispute of the Facts 44J, is where that is in the record, Your Honor. So yes, we disagree that a step was made toward Officer Hanson. Is that then how you would distinguish the Morgan case? Because as a general matter, it does look pretty close, factually. I think that how I would distinguish the Morgan case, Your Honor, is I believe how the Morgan case came down is that initially the qualified immunity was denied by the district court. Then they filed a motion for reconsideration because there was an admission in the record that Mr. Morgan had, in fact, taken a step toward the officer. So it was undisputed whether a step was taken toward the officer. Here it is hotly disputed whether a step was taken toward Officer Hanson. But would you concede that if it was factually determined that a step, particularly an aggressive step with a deadly weapon towards an officer, that deadly force would have been not a violation of constitutional rights? Well, I think the law is like if an aggressive step was taken, but that's not what we have here, Your Honor. I think that would be a state of Morgan. I'm giving the hypothetical that if that fact became determined, as opposed to as it seems now in dispute, that that would be enough to trigger qualified immunity. If there was an aggressive step taken, that would be a state of Morgan. But I would say we don't have that here. And I would say a jury would have to determine whether there was an aggressive step taken toward the officer. Because that's in dispute. I mean, we're essentially arguing facts here, not law. And that's why I keep going back to the argument that I think appellate jurisdictions in question, because there's not a pure legal issue. Thank you, Your Honor. I've explained the facts. I've set out the facts in our brief that he was surrounded. He didn't oppose a threat to anyone, including Officer Hanson. And 21 shots rang out. You can tell in the videotape when the shots rang out just by his movements. That's when he really moved toward Officer Hanson. And again, he's moving down the sidewalk. He fell on the sidewalk. He didn't fall where Officer Hanson was approaching. I'm running out of facts to talk about. Do you all have any questions? I think it's pretty clear, Your Honor, that this is a factual dispute. The judge looked at the evidence, looked at the video primarily, and found that there was a disputed issue of fact, whether he had probable cause to use excessive force. I'd also want to point out, since the city brought up the fact of the officers' statements, I think they can somewhat be attacked as to their credibility. A day or two after the shooting, all the officers gathered together in the presence of their attorney and came up with these statements. And they're remarkably similar. Some are overboard. One of the officers, I can't remember which one, and I apologize for that, acknowledged in his deposition that he kind of over-egged the pudding, that it wasn't an aggressive step. In fact, I think he called it a charge. He acknowledged that that wasn't true. So I think the statements of the officers, their credibility can be attacked also. And that's not exactly on point, but I think that kind of goes to the circumstances surrounding the shooting where on the cross-examination of, I think it was Officer Partain in, I forget the case, Gardner v. Berger, if that's how you pronounce it, the jury was allowed to draw inferences just from the cross-examination of the deputy on his testimony in a deposition, and summary judgment was reversed. We do think the 21 shots were excessive. That was unnecessary. The law seems to be that the shooting should stop.  All of those shots didn't strike, did they? You're correct, Your Honor. I believe four shots struck Mr. Raines. The shots were all over the place. I have just one question about this thing that happened two days after the shooting. Are you telling me that they took statements of an officer in the presence of other officers, so the officers all heard each other's statements as they were unfolding? Yes. That's how it came down, and in the presence of an attorney. Who was conducting the examination, the attorney? Because they were making these statements, someone must have asked some questions. Was it recorded? We don't have recordings of it. We just have the written statements, Your Honor. And it was not Mr. Wilkinson. We found that somewhat troubling. Is there anything else? Again, in summation, this is a very sad situation, and it's probably sad for the officers involved here, but we have somebody who's paralyzed. His constitutional rights were violated. The judge was correct in finding that a factual dispute exists, and a jury should be allowed to determine. Just because the case is affirmed doesn't mean the officers won't have their day in the court. They'll get to tell the jury their side of the story. We'll get to tell the jury our side of the story, and then the jury can answer whether Mr. Raines' constitutional rights were violated. Obviously, we think they were, and we'll argue strong for that. I'm sure Mr. Wilkinson will argue opposite of that. But in summation, we believe, because we're talking about facts, that appellate jurisdiction doesn't exist, and the facts are disputed on the issue of qualified immunity. Thank you, Your Honors. Thank you, Mr. Carter. Mr. Wilkinson, your rebuttal. First of all, I'll address the officer's statements really quickly. What I understand to have happened is they wrote the narrative. The three officers that shot, not Officer Hanson, not the firefighter, and certainly not the third-party witness, but the three officers were together, as my understanding. I wasn't there, of course. And they wrote their narrative for the police report together. Of course, Officer Hanson, and then they gave their statements to the city separately, as my understanding. So the narrative and then the statements were separate from that. I want to point you, I just want to say this. If there is a video, Scott v. Harris says that that's the fundamental question, what the video shows. But more than that, in this case, if we're unsure what the video shows, which I don't think that we are, I think Mr. Raines clearly takes two steps towards, at least in the general direction, he at least raises his leg as if to take a step in her general direction. But even saying that the video isn't clear, you've got the three officers, let's even set them aside. Let's say they're entirely discredited, simply because they wrote a narrative together. You have the firefighters, you have the third-party witness saying exactly the same thing, that Mr. Raines came at the officers, and you have Rachel Hanson saying, I feared for my life. In fact, in her deposition, she thanked the officers for saving her life that day. There's no dispute as to what happened. John Raines doesn't dispute what happened. And why he doesn't dispute it, I don't know why he doesn't remember, but the fact is he can't dispute what happened. And what was interesting about Mr. Carter's argument is he admitted that Raines moved towards Hanson. Now, granted, it was after the first shots he concedes, but he concedes that he moved towards Hanson. So the argument apparently is for the appellee that initially he wasn't moving towards her. But after the shots rang out, then he really moves towards her. So if the first shots don't hit him, because he's not paralyzed, and he doesn't seem to be wounded on the video, if he's coming at her charging, those shots are certainly justified because he's just admitted that that was definitely when John Raines went at Rachel Hanson. Is it undisputed that the first, whether the first shot hit him or not? Well, the one in the back certainly didn't. And the video, I should have clarified that. I meant the one in the back, I'm sorry. The one in the back certainly didn't hit him. I can't tell from the video, of course, whether he was shot or not. But the fact is he does go towards her after the shots were fired. He's not dissuaded by the shots being fired. Is there any testimony or evidence about the effect of being shot on the body that would cause it to topple one way or the other, not on his own volition? No, and that's why I should have limited that to the back shot. Because the back shot is the one we know. We know he wasn't shot in the back because he was paralyzed by the shot in the back. And so I should have clarified that. But my fundamental point is the appellees have agreed that he's moving towards her. Well, the appellees also said here in their argument that he was moving down the sidewalk and that Officer Hanson was not on the sidewalk. What does that mean, if anything? I mean, the video shows that that's not accurate. I mean, to be honest, the case rises and falls in the video. I know that. I've always known that. But it's buttressed. If we're not so sure what happened, it's buttressed by the fact that the three officers, the firefighters, the third-party witness, and Rachel Hanson all say the same thing. There is simply no dispute. If the Taser video is two-dimensional, doesn't have the great sound, has a bad angle, all that, fine. Let's set it aside. But it doesn't change the fact that all the officers, all the firefighters, the third-party witness, all saw the same thing. And that's a justified shooting. And certainly under Morgan v. Cook, the officers are entitled to qualified immunity. Thank you very much. Thank you, Mr. Wilkerson. Thank you also, Mr. Carter, for your presence here this morning and the argument you've provided to the court to help with a difficult case. The briefing that you've submitted will take it under advisement. You may be excused.